# FILED

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

JAN 2 2 2019

TIMOTHY M. O'BRIEN CLERK
By _____CA_____ Deputy

# UNITED STATES DISTRICT COURT

for the

Kansas City District of Kansas

Kansas City - Leavenworth Civil Division

|  |  |
|---|---|
| Scott B. Sullivan | Case No.  2:19-cv-02034-JAR-JPO |
| _____ | *(to be filled in by the Clerk's Office)* |
| **Plaintiff(s)** | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Jury Trial:  *(check one)*   ☒ Yes   ☐ No |
| -v- | |
| HCA HEALTHCARE, INC.;  FAMILY HEALTH MEDICAL GROUP OF OVERLAND PARK, LLC; DR. HERBERT MCCOWEN; DR. RICHARD RUIZ; MICHELLE SAFFORD; (see attached) | |
| **Defendant(s)** | |
| *(Write the full name of each defendant who is being sued.  If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

## COMPLAINT FOR A CIVIL CASE

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Scott B. Sullivan |
| Street Address | 7214 W 71st Terrace |
| City and County | Overland Park, Johnson County |
| State and Zip Code | KS 66204 |
| Telephone Number | 913-265-5949 |
| E-mail Address | scott@nerd-911.com |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

| | |
|---|---|
| Name | HCA Healthcare, Inc. |
| Job or Title *(if known)* | Legal Department |
| Street Address | One Park Plaze |
| City and County | Nashville, Davidson County |
| State and Zip Code | TN 37203-6527 |
| Telephone Number | (615) 344-9551 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | Family Health Medical Group of Overland Park, LLC |
| Job or Title *(if known)* | Legal Department |
| Street Address | One Park Plaza |
| City and County | Nashville *Davidson County* |
| State and Zip Code | TN 37203 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | Dr. Herbert McCowen |
| Job or Title *(if known)* | MD |
| Street Address | 7381 West 133rd St Ste 100 |
| City and County | Overland Park, Johnson County |
| State and Zip Code | KS 66213 |
| Telephone Number | (913) 491-1616 |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | Dr. Richard Ruiz |
| Job or Title *(if known)* | MD |
| Street Address | 7381 West 133rd St Ste 100 |
| City and County | Overland Park, Johnson County |
| State and Zip Code | KS 66213 |
| Telephone Number | (913) 491-1616 |
| E-mail Address *(if known)* | |

ADDITIONAL DEFENDANTS

a.  Diana Rutherford - Mother of the Plaintiff

8722 Greeley Dr.

Kansas City, Wyandotte County

Kansas 66109

b.  Susan Williams - Sister of the Plaintiff

8722 Greeley Dr.

Kansas City, Wyandotte County

Kansas 66109

c.  Steve Sullivan - Brother of the Plaintiff

11437 Georgia Ave

Kansas City, Wyandotte County

Kansas 66109

d.  Lisa Sullivan - Sister in law of the Plaintiff

11437 Georgia Ave

Kansas City, Wyandotte County

Kansas 66109

e.  Michelle Safford - Wife (common law, domestic partnership) of the Plaintiff

Current Address Unknown

f.  Janet Gereau - Mother of Michelle Safford

8218 N Revere Ct

Kansas City, Clay County

Missouri 64151-1066

g.  Jonathan Alan Keck, II - Son of Michelle Safford

Current Address Unknown

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒  Federal question                  ☒  Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

The Americans with Disabilities Act
The Civil Rights Act
The False Claims Act
The Whistleblower Act
et. Al.

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

a.     If the plaintiff is an individual
The plaintiff, *(name)*  Scott B. Sullivan                           , is a citizen of the
State of *(name)*  Kansas                           .

b.     If the plaintiff is a corporation
The plaintiff, *(name)*                           , is incorporated
under the laws of the State of *(name)*                           ,
and has its principal place of business in the State of *(name)*
                          .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

a.     If the defendant is an individual
The defendant, *(name)*                           , is a citizen of
the State of *(name)*                           . Or is a citizen of

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

(foreign nation) _____ .

b.   If the defendant is a corporation

The defendant, *(name)*   HCA Healthcare, Inc. _____ , is incorporated under

the laws of the State of *(name)*   Delaware _____ , and has its

principal place of business in the State of *(name)*   Tennessee _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.   The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

The intentional and / or negligent misdiagnosis of Tarlov Cyst Disease and the refusal of health care professionals to properly diagnose and treat Tarlov Cyst Disease are ongoing violations of patients' rights under The Americans With Disabilities Act, The Civil Rights Act, The Kansas Consumer Protection Act, patients' contracts with health care providers and insurers, and numerous additional federal and state statutes; resulting in life-long disability, excruciating pain, psychological trauma, and, in many cases, wrongful death. Acts of malpractice and misdiagnosis are permanently recorded in patients' medical records, resulting in what Dr. Herbert McCowen described as the "Flagging" of patients and perpetual disenfranchisement from all access to medical care, economic participation, and even legal representation, due process of law, and access to justice for the remediation of past harms or prevention of future harms. Direct financial harms almost always exceed $75,000 for persons with Tarlov Cyst Disease. Damages in cases which result in wrongful death frequently exceed $1,000,000. Civil Penalties under the Kansas Consumer Protection Act and the included Enhanced Civil Penalty may be up to $20,000 per day for ongoing violations committed against "Protected Consumers" (including those with disabilities) for up to three years, or $21,900,000

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

My name is Scott B. Sullivan. I have Tarlov Cyst Disease. And I have Tarlov Cysts. The distinction is relevant. I have been denied medical care necessary and proper for the treatment of my Tarlov Cysts Disease and for the resection or aspiration of Tarlov Cysts for more than seven years, subsequent to a work-related injury which occurred on January 9th, 2012 (which is alleged to be the causal trauma in the formation of my Tarlov Cysts).  I have been persistently accused of being an opiod drug seeker, an opiod addict, a fraud, a faker, a malingerer, a hypochondriac, and even "schizophrenic and possibly psychotic" on the sole basis that these defendants (and others like them) do not believe in my symptoms and do not acknowledge Tarlov Cyst Disease.
I was denied medical care by Dr. Herbert McCowen on January 19th, 2016..(see attached "Continued Pleading")

1. By my estimate, more than 4,000 people every year take their own lives due to the pain and suffering of Tarlov Cyst Disease. This estimate includes both intentional suicides -- which are the number one documented cause of death for persons with Tarlov Cyst Disease -- as well as accidental overdoses, which are a predictable result of the disenfranchisement from medical care and physical and psychological abuse and neglect commonly suffered by people with Tarlov Cyst Disease.

2. It is estimated that between 5% and 13% of the general population has Tarlov Cyst Disease; and that 1% to 2% of the population has "symptomatic" Tarlov Cysts. That equates to between15 million and 39 million people who are at risk for the development of Tarlov Cysts as the result of an otherwise minor sacral, lumbar, cervical and thoracic  spinal injury. That equates to an estimate between 3 million and 6 million people who suffer from symptomatic Tarlov Cysts. A full and accurate analysis of the data, if such were possible, would likely show these numbers to be artificially low due to the systematic under-reporting and misdiagnosis of Tarlov Cyst Disease.

3. According to one study, 97.5% of people who receive MRIs for lumbar, sacral, and radicular neurological symptoms in which Tarlov Cysts are identifiable as a plausible or even probably cause of their symptoms are never even told that they have Tarlov Cysts, or that they have Tarlov Cyst Disease.

4. Instead, nearly 100% of patients who have Tarlov Cyst Disease are told that there is no "organic cause" for their symptoms -- with many physicians going so far as to claim that the patient is mentally ill; that they are imagining or exaggerating their

symptoms; that they suffer from hypochondria, from "Munchausen Syndrome," or even that they are "schizophrenic, and possibly psychotic."

5. One doctor -- a neurosurgeon -- advising a VA doctor on the Studentdoctor.net forums on how to treat a female patient with Tarlov Cysts advised that he diagnose her with "Crazy Lady Syndrome" and get rid of her. This type of abuse and neglect and intentional medical malpractice is rampant throughout the entire American health care industry, and is almost universally reported by people with Tarlov Cyst Disease who participate in Tarlov Cyst Support groups.

6. Multiple studies have shown that Tarlov Cyst Disease and symptomatic Tarlov Cysts disproportionately affect women -- with prevalence as high as 90% among female patients (compared to male patients.)

7. People with symptomatic Tarlov Cysts suffer from a wide variety of symptoms: ranging from "mere" chronic back pain, to pelvic pain, sciatic pain (pain in the legs and feet), perineal pain, rectal pain, genital pain, loss of bowel and bladder control; and many "bizarre" and seemingly inexplicable symptoms: such as cerebral spinal fluid hypotension induced headaches (sometimes referred to as "Thunderclap" headaches, pressure in the eyes, ears, and sinuses; momentary blindness, deafness, ringing in the ears, deafness, dizziness, abdominal pain and vomiting; and rare sexual dysfunctions such as Persistent Genital Arousal Disorder (persistent, uncontrollable, and painful neurological stimulation of the perineum, genitals, vagina, and rectum accompanied by spontaneous orgasmic neurological response.)

8. The high prevalence among women, along with the often embarrassing nature of symptoms and frequently misogynistic responses from the male dominated health

care industry (particularly in the fields of neurosurgery and orthopedic surgery...those professions most often consulted by persons diagnosed with Tarlov Cyst Disease) has been identified as a primary cause of the under-reporting, misdiagnosis, mistreatment, and perpetual medical malpractice to which persons with Tarlov Cyst Disease are routinely subjected.

9. My personal symptoms had escalated from "chronic back pain" to radicular neuropathy in my legs and feet within one month of the causal injury which I sustained on January 9th, 2012.

10. Within two months, my symptoms had escalated to radicular pain in my hips, legs, and feet which, along with the central "chronic back pain" continued to escalate for the duration of the ensuing seven years; and which continues to escalate to this day.

11. At approximately two years subsequent to my injury, I had experienced multiple incidents of the "stroke like" symptoms which would ultimately be attributed to cerebral spinal fluid hypotension.

12. And in April of 2014, while undergoing a physical examination performed by Dr. Tahani at The University of Kansas Medical Center I experienced the first of the genital symptoms -- a sudden, sharp, and intense stabbing pain through the length of my penis -- while Dr. Tahani performed a "pendulum test" on my right leg.

13. These symptoms continued to escalate and recurred with increasing regularity, accompanied by a persistent escalation of what Ms. Safford described as "Restless Leg Syndrome" until October 15th, 2015; at which time I experienced violent and uncontrollable spasms in my right leg; followed by near-total momentary blindness

and severe ringing in my ears when I stood up; which prompted me to have Michelle call 911; after which I was taken by ambulance to Menorah Medical Center.

14. After a brief amount of ridicule from the attending physician, an MRI was ordered; and Menorah Medical Center's radiology department identified "multiple" Tarlov Cysts in my sacral nerve roots; but failed to specify the precise number, size, or locations of the cysts.

15. I was advised to follow up with my primary care physician, who, at the time was Dr. Richard Ruiz of Family Health Medical Group of Overland Park, KS.

16. Dr. Ruiz was unable to see me until January 19th, 2019; and so I scheduled an appointment for a follow up examination on that date.

17. During the period from October 15th, 2015 through December of 2015 and January of 2016; my relationship with Michelle Safford rapidly declined; most particularly subsequent to December 15th, 2015; when an event occurred which I may or may not be permitted to discuss due to confidentiality agreements which were ultimately signed in April and May of 2016 in pending litigation before the Johnson County District Court -- litigation which has substantial relevance to the claims alleged herein.

18. From December 15th, 2015 through December 27th, 2015; Ms. Safford and I engaged in extensive discussions related to threats of blackmail, extortion, witness intimidation, and racketeering relevant to my then pending claims before the Kansas Department of Labor's Worker's Compensation Division and before the Kansas Insurance Commission regarding the alleged frauds committed against my by my employer -- OnForce, Inc, and their insurers: Twin Cities Fire Insurance, The

Hartford, Wells Fargo, United States Liability Insurance and Wessco (Berkshire Hathaway Companies), The Travelers, CNA Insurance; and the medical services providers selected by OnForce and The Hartford to provide for my care: Concentra, Premier Spine Care, Apex Orthopedic (formerly Carondolet), Mid-America Orthopedic; and the health care providers whom I had selected: including Shawnee Mission Medical Center, The University of Kansas Medical Center, St. Luke's South, Menorah Medical Center, and the various affiliated primary care physicians, orthopedic surgeons, and neurosurgeons, and emergency medical care providers involved..

19. Ms. Safford demanded that I accept the settlement offered by OnForce and The Hartford, that I relinquish all of my claims in the concurrently pending litigation; and threatened that if I did not accept the terms that I would be blackmailed, that I would be killed, that very specifically " they will make it look like suicide", that I would be framed for potentially multiple wrongful deaths,; but that "they" ( unspecified individuals whom she also once referred to as "the people who are helping me") "will allow you to leave the State with as much as you can carry."

20. During this time, and for eight months prior, Ms. Safford and her son -- Jonathan Alan Keck II -- had engaged in a series of acts of complete and total neglect of the home, escalating to the level of vandalism; including the failure and refusal to dispose of trash and garbage for over eight months, the accumulation of piles of trash, laundry, bed sheets and draperies on the floors of every room of the house, the failure and refusal to clean the litter boxes of their multiple cats, resulting in the cats urinating and defecating in the piles of laundry, drapes and bed sheets on the

floor; and the accumulation of more than 241 bottles of urine in Jonathan's bedroom which, along with the trash and unkempt laundry formed piles as high as the top of the bed and covered nearly every square inch of the floor.

21. In response to my demands that Ms. Safford require that her son seek mental health counseling and that the two of them conduct all necessary cleaning and repairs of the home; Ms. Safford demanded that I voluntarily submit myself for in-patient psychological evaluation; for the first time in the nearly four years subsequent to my injury, and only two months after the discovery of my Tarlov Cysts, asserting the position that my physical symptoms and escalating disability were psychosomatic in origin.

22. During that time, Ms. Safford was also under the care of Dr. Herbert McCowen for a medical condition which was ultimately determined to be potentially life threatening; and which both she and Dr. McCowen believed to be aggravated by the stress of my pending litigation and increasing disability and her son's mental illness.

23. Ms. Safford and I had discussed at great length her experience with Dr. Herbert McCowen; and she had long been exceedingly pleased with his services. It was in fact, Ms. Safford's praise of Dr. McCowen which had initially prompted me to seek assistance from Dr. Richard Ruiz -- who is a partner along with Dr. McCowen at Family Health.

24. Specifically, Ms. Safford had informed me relatively early in her relationship with Dr. McCowen that she had discussed my health, my injury, my escalating symptoms, and the legal barriers which had prevented me from obtaining health care via

previous providers; and according to Ms. Safford, Dr. McCowen had responded "Oh my God, He's been flagged."

25. Ms. Safford ultimately abandoned our relationship on December 29th, 2015; returning to the home only a few times to collect personal belongings; and was thus unavailable to transport me to my scheduled January 19th, 2016 appointment with Dr. Ruiz.

26. Because Ms. Safford was unavailable at that time, I asked that my mother, Diana Rutherford, take me to my appointment with Dr. Ruiz on January 19th, 2016; and she agreed.

27. While Ms. Rutherford drove me to Family Health, I began to explain to her the recent diagnosis of Tarlov Cyst Disease, and we continued that discussion in the waiting room of Family Health. Her response was dismissive, escalating to abusive, as described more fully below.

28. Upon arrival at Family Health, and upon check in, I asked if I could be seen by Dr. McCowen instead of by Dr. Ruiz, due to Dr. Ruiz's previous reluctance to become involved in diagnosis or treatment of a work-related injury; and Dr. McCowen agreed to see me in lieu of Dr. Ruiz.

29. While awaiting my appointment, I continued to discuss the Tarlov Cyst Diagnosis with my mother, whose response evolved from dismissive to aggressive -- stating that she "has been listening to this shit for four years"; that she was "tired of it;" and that, as to the relationship to my work-related injury: "That was four years ago. That's got nothing to do with it."

30. Though I had, as yet, done little research on Tarlov Cyst Disease, I had at that point already learned that suicide was the leading cause of death for people with Tarlov Cyst Disease; and in expressing this point to my mother (and in response to her anger and dismissiveness) I said to her "Mom, Dr. Prostic is killing people"; which, in context, I expected to be clearly understood to mean that the rampant medical malpractice, particularly common within the worker's compensation system, was causing and contributing to thousands of cases of mental illness, Post Traumatic Stress Disorder, Litigation Abuse Syndrome, anxiety, depression, untreated chronic pain, and ultimately to extraordinarily high rates of suicide and accidental opiod/alcohol/and anti-depressant overdose.

31. It was at this point that my mother got up from her chair, huffed, and walked away. After about five to ten minutes during which she did not return, I got up from my chair, got into the wheelchair which the staff had provided, and rolled around the partition behind which we had been seated, and saw my mother standing behind the counter with Dr. McCowen's staff.

32. According to her, she only asked if they "could put my son in a room away from the other patients" and made no further comments to the staff regarding my physical condition, prior medical records, or her presumption that my symptoms were entirely psychosomatic.

33. Shortly thereafter I was called upon and taken to an examination room where I was asked to await Dr. McCowen.

34. Dr. McCowen entered the room a short time later, and immediately announced "Scott, I am not going to look at your back." and asked "is there anything else that I can do for you today."

35. At this point, I asked him to look at numerous cuts and abrasions that I had sustained while attempting cleaning and repairs of the home; and informed him of my concern due to the fact that while attempting to clean and repair the home, a beer bottle filled with urine fell from a top shelf, splattering urine on my face, hands and arms; including on the various cuts and scrapes which I had sustained. Dr. McCowen responded gruffly "That's not how diseases are transmitted" and gave me a half a dozen rubber gloves and a prescription for a high strength anti-biotic ointment. He then asked if there was anything else, and I indicated to him that I would like to discuss smoking cessation; to which he responded "Do you have your insurance card?" I provided him with my insurance card, he turned it over, pointed to the Mental Health hotline number, and said "Call that number." I thanked him. He left the room. I got dressed, gathered my things, and left. That was the full extent of the services provided by Dr. McCowen on January 19th, 2019.

36. After leaving Dr. McCowen's office, Ms. Rutherford drove me to a nearby CVS Pharmacy to fill my prescription for the anti-biotic ointment, and then to a nearby T-Mobile Store to get a new cell phone (as I had only a very unreliable Voice Over IP phone service subsequent to the departure of Ms. Safford.)

37. At the T-Mobile store I met a woman who inquired about my difficulty in walking, and when I had explained briefly that I had Tarlov Cyst Disease but could not get medical care due to legal complications with my insurance, she volunteered that her husband

was a retired attorney and that he might be able to give me a referral. When her husband came in a few moments later, I asked if he might be able to "help..." and before I could even complete a sentence my mother grabbed me by the arm from behind, yanked on me and yelled "STOP TALKING TO THAT MAN."

38. The sudden twisting motion pinched the nerves in my spine, my legs collapsed beneath me; and coupled with the fact that I had foolishly worn slick soled shoes even though it had snowed overnight and into the morning; I spun and slipped and fell to the ground; and my mother immediately began screaming; telling the store's manager to call an ambulance, because she was not going to take me home; and then circulating among the customers, apparently telling them that I had been attempting to fake a worker's compensation claim for more than four years, that I had been diagnosed by a police department psychologist as schizophrenic, and even going so far as to inform people that I had built a back brace that I believed would allow me to lift a car, despite the fact that I claimed that I could barely walk and frequently feel down due to pain.

39. An ambulance crew was called, and while awaiting the arrival of the ambulance crew, I emphatically denied any intention to sue the store, as the manager of the store had taken out his cell phone and was recording the entire sequence of events. After the ambulance crew arrived, they spoke with my mother, and immediately began to ask me "mental health" questions: such as "Do you know what day it is? or what year it is?" and to attempt to confirm whether or not I had invented a back brace that would allow me to lift a car.

40. I refused transportation to an emergency room, clearly stating that I had not sustained any new injuries, and that I was not in any way mentally ill. The ambulance crew agreed, and remained on the scene only to await a taxi, as my mother continued to refuse to take me home. Due to the recent snow and poor road conditions, a taxi was not immediately available, and my mother eventually agreed to take me home; though only after I had been subjected to near ceaseless ridicule from one of the responding EMT's, particularly with respect to the statement by my mother that I believed that I could lift a car when wearing my home-made back brace.

41. After leaving the T-Mobile store, my mother continued to drive very recklessly, instigating further arguments between us, even until the last moment when I exited her car.

42. Shortly thereafter, I received a call from my sister, Susan Williams; who began almost immediately screaming at me; declaring that I "no longer have a family," that I "don't have a mother," that I was completely disowned from the entire family, and that I was "killing" my mother; because my actions and my persistence in attempting to get medical care would aggravate her medical condition, resulting in her wrongful death.

43. Over the course of the ensuing months, I would eventually receive multiple confirmations and admissions of the various slanderous and libelous statements which my family had made to friends, to family, to authorities, and presumably to Dr. McCowen's staff which had formed the basis for their belief that I suffered from mental illness. Among these were the allegations that I believed that my wife,

Michelle Safford, had poisoned my pain pills in March of 2012; that I believed that my mother had poisoned my cookies in March of 2012; that I had engaged in "hard core drug parties" with Ms. Safford, and with her son Mr. Keck, and with his girlfriend; that I had faked my injury to get drugs and to get money; that I had stolen files from my sister's computer during the March of 2012 visit to my mother's home; that I believed that "everyone was out to get me"; and that all of the allegations of fraud, medical malpractice, and all of my defenses and counterclaims in the ongoing legal disputes were all the result of drug induced schizophrenia.

44. A very specific note: at this moment, as I type, it is 7:18PM on January 22, 2019. I literally have less than five hours before the statutes of limitations expire on Kansas Consumer Protection Act Claims regarding the services rendered on January 19, 2016; and regarding the allegation that the behaviors of my mother and of my sister on that day were a part of their own ongoing pattern of abusive, and deceptive, and unconscionable acts intended to obstruct my access to medical care for personal, vindictive, retaliatory, and even political reasons. (Specifically, their opposition to worker's compensation and to subsidized health care and welfare programs for the disabled.) I am in excruciating pain. And I have (though you can't tell from reading this) been trying for three years to get the medical care that I need without resorting to litigation; while simultaneously attempting to write sufficient pleadings to possibly sustain some legal rights in what I already know to be a brutal and hopelessly corrupt legal culture. I am pushing myself way beyond my limits to try to file even a rudimentary pleading before midnight; and I honestly have no hope that I will be able to endure even more litigation.

45. But I have no choice. I can't live like this. I have exhausted every other source of relief. And the pain is too intense, and the flare ups are too frequent. I am experiencing new, and escalated symptoms with great regularity. I need medical care immediately if there is any hope to avoid permanent nerve damage; and that is presuming that I have not already passed the point of permanent nerve damage.

46. I am aware that this case is impossibly complex; due in particular to the vast amount of abuse that I have endured for over seven years; all of it relevant, because the pain and the damages that I am suffering now, at this very moment, all have their genesis in a work related injury from seven years ago; and in the nearly universal hatred of the worker's compensation system, the nearly universal paranoia and mass hysteria over the opiod drug war, and the nearly universal hatred and mistrust of people who seek disability due to "chronic back pain."

47. It is now and always has been my primary objective to receive medical care and to NOT be disabled for the rest of my life.

48. Tarlov Cysts are treatable, even if Tarlov Cyst Disease is not curable.

49. But nothing is treatable when nearly the entire American Medical Association refuses to acknowledge the disease.

50. I am trying in good faith to do only that which is necessary to obtain medical care and to repair the damage done by the literally hundreds of people who have been a part of the abuse and neglect which I have suffered; and to put an end to the systematic abuse and neglect that everyone with Tarlov Cyst Disease suffers.

51. It is acknowledged by everyone who knows me that I am a very intelligent and rational man. But the pain that I endure has had an obvious and even measurable

impact upon my ability to perform any task -- even typing, even sitting up and researching and reading -- for any period longer than 30 minutes at a time.

52. I was rated 82% disabled by Dr. Estaban Azevedo -- my physical therapist -- more than four years ago. I have received no corrective treatment. I am on no medications of any kind. I have no access to medical care of any kind. And that 82% disability rating was given more than a full year before we even knew that the cause of my disability was Tarlov Cyst Disease. I have only gotten worse in the ensuing three plus years.

53. And I will continue to get worse every day for the rest of my life. Tarlov Cysts do not heal naturally. They do not repair naturally. And they are aggravated by all forms of motion -- even the tiny "micro-motions" that occur when sitting upright, typing, or bending and twisting to sort through files and records.

54. Long term effects of repetitive stress and trauma to the spinal nerve root sheaths which are dilated by Tarlov Cysts include not only gradual and cumulative dilation of the cysts; but also (in many cases) erosion of the sacral foramina from the repetitive dragging of the cystic nerve roots across the bones. In some cases, this weakens the bones to the point that patients experience stress fractures of the sacrum. In many cases this weakens the nerve root sheaths to the point that they experience leaks and even ruptures; with the potentially (though admittedly rare) result of cerebral spinal fluid hemorrhage. Even minor cerebral spinal fluid leakage can cause debilitating "stroke-like" symptoms (as described above); including the excruciating headache and blurred vision that I am experiencing at this very moment.

55. Incorporating these facts, and the readily available common knowledge regarding Tarlov Cyst Disease (which will be further documented in forthcoming affidavits and exhibits), I bring the following allegations and requests for relief:

COUNT I - ALL RELIEF

56. Incorporating all facts alleged above and below, and the factual content which will be developed upon completion of discovery and the filing of affidavits and exhibits;

57. Pursuant to Federal Rule 54(c)

58. And as an argument for expansion of common law pursuant to Federal Rule 11

59. Plaintiff alleges to have been harmed by the defendants.

60. Plaintiff has been deprived of medical care for more than seven years for a congenital connective tissue disorder known as Tarlov Cyst Disease which was rendered symptomatic as a result of a work-related injury.

61. Plaintiff has endured constant and escalating physical pain; and the intentional and / or negligent infliction of mental anguish and emotional distress.

62. Plaintiff's contracts for medical care with all named (and unnamed) health care services providers have been breached.

63. Plaintiff has been rendered in excess of 80% disabled is unable to engage in gainful employment.

64. As a direct result of the refusal of all parties involved to acknowledge the truth regarding Tarlov Cyst Disease, including without limitation persistent slanderous, libelous, and perjurous statements made by defendants; plaintiff is additionally unable to qualify for disability benefits either via worker's compensation or via social security due to lack of expert testimony and legal representation

65. Plaintiff has been effectively disenfranchised from all economic participation; and is completely reliant upon food pantries and meager donations from church and friends for all economic and physical sustenance.

WHEREFORE, Plaintiff requests all relief to which he is entitled under the facts of the case, and under the laws of The United States of America and of The State of Kansas, whether such relief has been requested in the pleadings or not.

COUNT II - AMERICANS WITH DISABILITIES ACT, HEALTH CARE PROVIDERS

66. The following defendants are engaged in the "Healing Arts" as defined by Kansas Statutes K.S.A. 65-2802  K.S.A. 65-2802 defines "The healing arts" to include "**any system, treatment, operation, diagnosis, prescription, or practice for the ascertainment, cure, relief, palliation, adjustment or correction of any human disease, ailment, deformity, injury, alteration or enhancement of a condition or appearance...**"

   a. **HCA Healthcare, Inc.**

   b. **Family Health Medical Group of Overland Park, LLC**

   c. **Dr. Herbert McCowen**

   d. **Dr. Richard Ruiz**

   e. **Menorah Medical Center**

67. Family Health and Menorah Medical Center are subsidiaries of HCA Healthcare, Inc.; whose business practices are thus under the control of HCA Healthcare; and

operated pursuant to the requirements and guidelines enforced upon them by direction of HCA Healthcare, Inc.

68. Dr. Herbert McCowen and Dr. Richard Ruiz are employees, or independent contractors of Family Health; and subject to the supervision and bound by the business practices of Family Health and HCA Healthcare, Inc.

69. Plaintiff , Scott Sullivan first sought medical care through HCA Healthcare provider Family Health physician Dr. Richard Ruiz on February 4th, 2014; based upon the recommendation of Michelle Safford who had expressed satisfaction with the services provided by Dr. Herbert McCowen.

70. At that time, Dr. Ruiz refused to provide any diagnostic or treatment regarding Mr. Sullivan's back injury; citing the pendency of Mr. Sullivan's worker's compensation claim as his basis for refusal of service.

71. Plaintiff first sought health care through Menorah Medical Center on October 15th, 2015; at which time he was diagnosed with Tarlov Cyst Disease.

72. The MRI report generated by the radiology department of Menorah Medical Center on October 15th, 2015 did not contain full diagnostic information; specifically, the report did not identify all Tarlov Cysts by number, size, and location; citing only that the largest cyst was "8mm", but not providing the full three dimensional size of location of the cyst.

73. Mr. Sullivan was provided with no information regarding Tarlov Cyst Disease by the Emergency Room Physician on October 15th, 2015; and was instructed to direct all inquiries to his primary care physician, Dr. Ruiz; and to seek referall to a qualified neurosurgeon for further evaluation.

74. Mr. Sullivan scheduled an appointment with Dr. Ruiz for January 19th, 2016; which was changed to Dr. Herbert McCowen on January 19th, 2016, as described more fully above.

75. As of January 19th, 2016; Dr. Herbert McCowen had been fully informed of Mr. Sullivan's medical condition and insurance complications by Michelle Safford -- Mr. Sullivan's wife by consent, by admission, and by Kansas Common law; including without limitation the fact that Mr. Sullivan had recently been diagnosed with Tarlov Cyst Disease.

76. Additionally, Mr. Sullivan had informed Family Health at the time of scheduling that the purpose of the visit was as a follow up to the emergency room visit of October 15th, 2015; and that Mr. Sullivan had been diagnosed with Tarlov Cysts, and with Tarlov Cyst Disease.

77. Upon entering the examination room, Dr. Herbert McCowen refused medical service to Mr. Sullivan relevant to his "back" in its entirety; and relevant to Tarlov Cyst Disease; stating no specific reason for his refusal; but continuing to provide a very cursory evaluation of the various cuts, scrapes and abrasions which Mr. Sullivan had suffered in the days immediately preceding the examination.

78. Subsequent research by Mr. Sullivan has revealed an industry wide negligence, systemic medical malpractice, and near universal refusal of health care providers to provide the necessary and appropriate diagnostics and treatments to all persons who suffer from Tarlov Cyst Disease.

79. HCA Healthcare and all of its subsidiaries, employees, and contractors are alleged to be engaged in the willful and negligent denial of medical care to sufferers of Tarlov Cyst Disease.

80. Pursuant to common knowledge and common law, HCA Healthcare and all of its subsidiaries, employees, and contractors are subject to the jurisdiction of The United States Federal Court; and subject to requirement of the Americans with Disabilities Act.

WHEREFORE, Plaintiff Scott B. Sullivan seeks declaratory judgment, injunctive relief, damages, punitive damages and civil penalties in excess of $75,000 for defendant's HCA Healthcare and HCA Healthcare subsidiaries, employees, and contractors' violations of The Americans with Disabilities Act.

COUNT III - KANSAS CONSUMER PROTECTION ACT - HEALTH CARE SUPPLIERS

81. The following defendants are suppliers of consumer services as defined by The Kansas Consumer Protection Act;  K.S.A. 50-623 et. seq.

   a. **HCA Healthcare, Inc.**

   b. **Family Health Medical Group of Overland Park, LLC**

   c. **Dr. Herbert McCowen**

   d. **Dr. Richard Ruiz**

   e. **Menorah Medical Center**

82. The Plaintiff, Scott B. Sullivan, is a protected consumer on the basis of his disability / infirmity; as defined by The Kansas Consumer Protection Act, K.S.A. 50-676 et. Seq.

83. Defendants HCA Healthcare, Family Health Medical Group, Dr. Herbert McCowen, Dr. Richard Ruiz, and Menorah Medical Center are thus subject to both civil penalties and to enhanced civil penalties, in addition to declaratory judgment, injunctive relief, and supplemental to damages in amounts totaling up to $10,000 per violation for deceptive and / or unconscionable acts; and up to $10,000 per day for deceptive and / or unconscionable practices for each day during which such practices are ongoing; plus an additional Enhanced Civil Penalty of up to $10,000 for each violation and for each day of ongoing violations of either deceptive or unconscionable acts or practices.

84. Incorporating all facts alleged above and below, on two separate occasions physicians employed or contracted by HCA Healthcare and Family Health Medical Group of Overland Park -- Dr. Richard Ruiz (on February 4th, 2015) and Dr. Herbert McCowen ( on January 19th 2016) refused to provide medical services to plaintiff Scott B. Sullivan for a back injury, for the formation of Tarlov Cysts, for Tarlov Cyst Disease, and the subsequent escalation of symptoms both physical and psychological.

85. On February 4th, 2015, Dr. Richard Ruiz explicitly stated his refusal to examine Mr. Sullivan's back on the basis that he did not want to be involved in the provision of health care to a person who may be subject to a worker's compensation claim.

86. On October 15th, 2015, Dr. Herbert McCowen refused all health care services related to Mr. Sullivan's back; with no further explanation of his reasons for refusal.

87. Both Dr. Ruiz and Dr. McCowen made their decisions to deny medical care based upon business considerations.

88. Additional research has revealed what is common knowledge -- that health care providers regularly refuse services to persons who have been injured at work; with the primary reason being that they fear difficulty in collecting payment from either the patient's primary health care insurer or from the patients' employers' worker's compensation insurers.

89. Both Dr. Ruiz and Dr. McCowen were aware in advance of their decisions to provide medical care that Mr. Sullivan was not subject to a legally binding contract for worker's compensation insurance; but rather was a victim of fraudulently force-placed insurance practices which Mr. Sullivan's employer "OnForce" has termed "1099 Worker's Compensation."

90. In addition to their mutual refusals to provide medical care, both Dr. Ruiz and Dr. McCowen subsequently and willfully slandered and libeled Mr. Sullivan by alleging that his symptoms were the result of mental illness and possibly opiod drug addiction.

91. Subsequent to the examination with Dr. Ruiz, at which he did agree to a cursory examination of numerous moles, a continually growing scar (suspected to be a keloid), a lump in Mr. Sullivan's neck, and a cyst on Mr. Sullivan's left shoulder; Dr. Ruiz offered to perform a blood test, which Mr. Sullivan stated that he could not afford that day; and Dr. Ruiz was then overheard saying to a nurse "You can always tell when they won't take a blood test." It is the reasonable presumption that Dr. Ruiz was referring to an unfounded opinion that Mr. Sullivan was a drug seeker, and that his back symptoms had no organic cause.

92. Subsequent to the examination by Dr. McCowen, at which he provided only cursory examination of multiple cuts and scrapes on Mr. Sullivan's hands and arms; Dr. McCowen wrote in Mr. Sullivan's medical records that Mr. Sullivan suffered from "schizophrenia, and possibly psychosis."

93. Dr. Herbert McCowen was fully aware of the truth of Mr. Sullivan's claims regarding his original injury and the subsequent development of symptomatic Tarlov Cysts; having been fully informed by Mr. Sullivan's wife, Michelle Safford.

94. Family Health, Dr. Ruiz, and Dr. McCowen enticed Mr. Sullivan to contract for services through deceptive means; having been fully informed at the time of scheduling; and having scheduled appointments with the full knowledge that they had no intention of providing the requested services.

95. Furthermore, Mr. Sullivan was unable to obtain any benefit from the services which were provided, as Mr. Sullivan's only known condition which required medical intervention was the damage sustained to his back and the subsequent development of Tarlov Cysts.

96. Additionally, Mr. Sullivan has suffered substantial and ceaseless harm vis-a-vis the complete disenfranchisement from all access to medical care; the escalation of his disability beyond the level of 90%, the potentially now irreparable harm of permanent sacral nerve damage, the loss of consortium, the loss of his domestic partnership with Ms. Safford, and the loss of support from family and friends.

97. Both Dr. Ruiz and Dr. McCowen were aware that the Kansas Worker's Compensation Act provides for a $500 "Non Authorized" allowance to be used by injured workers to seek second opinions from privately selected physicians.

98. As a result of Dr. Ruiz and Dr. McCowen's deceptive and unconscionable acts and practices; Mr. Sullivan was further delayed and ultimately denied the benefits that a thorough and competent medical evaluation may have contributed to the resolution of the concurrently pending worker's compensation / insurance fraud disputes.

WHEREFORE, Plaintiff seeks relief in the form of declaratory judgment, injunctive relief, damages, and / or civil penalties and Enhanced  Civil Penalties under The Kansas Consumer Protection Act in excess of $75,000

COUNT IV - INTERFERENCE WITH CONTRACT, CONSPIRACY, RACKETEERING - FAMILY

99. The following named defendants, hereinafter referred to collectively as "family" are alleged to have engaged in persistent abuse, neglect, slander, libel, intimidation, and racketeering for the purposes of interference with plaintiff's access to benefits under his private health insurance policy; interference with plaintiff's access to law enforcement and / or benefits under the allegedly fraudulent worker's compensation policies of plaintiff's employer, OnForce; witness intimidation with respect to plaintiff's other concurrent civil and criminal (property maintenance) legal disputes; and attempts to coerce global settlement releases to the benefit of opposing parties in all such cases; and attempts to extort the sale or surrender of plaintiff's home and primary residence.

   a.  Diana Rutherford - Mother of the Plaintiff

   b.  Susan Williams - Sister of the Plaintiff

   c.  Steve Sullivan - Brother of the Plaintiff

   d.  Lisa Sullivan - Sister in law of the Plaintiff

   e.  Michelle Safford - Wife (common law, domestic partnership) of the Plaintiff

   f.  Janet Gereau - Mother of Michelle Safford

   g.  Jonathan Alan Keck, II - Son of Michelle Safford

100.  Beginning almost immediately after they had become aware that I had been injured, my direct family members: Diana Rutherford, Susan Williams, Steve Sullivan, and Lisa Sullivan began to circulate rumors and speculations that I was faking my disability for the purposes of obtaining drugs and financial compensation from my employer, OnForce.

101.  Not long after my injury, and after consulting with multiple attorneys regarding the OnForce "1099 Worker's Compensation" insurance policies; it was made apparent to me that I would require a substantial retainer in order to secure legal representation; due to the complexity of the case, the large number of companies involved; and the differing opinions on whether or not I would be considered subject to The Worker's Compensation Act.

102.  In March of 2012 I approached my mother, who was the former personal assistant to the Director of The United States Department of Labor's Racketeering Division to request that she go with me to introduce me to the current staff, in the hopes that her support would lend credibility to my claims. I spent over an hour discussing the nature of the claims with my mother before my sister burst into the room screaming at me to "STOP THIS" and yelling "DO YOU HAVE ONE PIECE OF PAPER THAT PROVES WHAT YOU ARE SAYING?"

103.   I indicated to my sister that I did in fact have all of my documentation and emails with me on a back up hard drive, at which point she grabbed the box in which my hard drives were contained, held it above her head (as if playing keep-away) and yelled "I SHOULD BURN THESE HARD DRIVES."

104.   As the situation escalated, I decided that I would prefer to leave my mother's home, and placed a call to 911 to request a police escort; as my sister was acting violently and I was experiencing significant pain; and felt that I would be unable to defend myself is she attempted to prevent me from taking my possessions.

105.   This incident began a family feud which no one within my family will discuss rationally, nor even consider forgiveness; and which has formed the foundation of their subsequent abusive and slanderous allegations; as described in part above.

106.   Additionally motivating my family's abusiveness is an apparent dissatisfaction with the distribution of my father's estate upon his death; which included my father's wish that I be allowed to purchase his home from the estate for an agreed upon amount of $75,000.

107.   According to my grandfather, Leon Olson, my family has not acknowledged that they were compensated via the estate for the purchase of the home. In his words "I know that your brother and sister gave you that house."

108.   My family further is of the opinion that I have failed to properly maintain the home; despite the fact that I was in the process of renovating the home at the time of my injury; and they have accused me of "destroying" the house.

109.   Shortly after the March 2012 dispute (the specific date will be included in a supplemental pleading) I asked my brother, Steve Sullivan, who was the owner /

operator of a fund raising company called "Full Blown Entertainment" to assist me with a fund raiser to attempt to acquire the retainer requested by one attorney who had expressed willingness to represent my claims against OnForce, et. Al.

110.   My brother refused, stating "No one gives money for back pain" and that he would not provide fund raising services for a claim involving what he at that time considered to be only minor back pain and suspected malingering, fraud, and drug seeking behavior.

111.   My family was aware of the circumstances of my insurance disputes; and were aware of my status as an independent contractor doing business out of my primary residence.

112.   My brother did offer to purchase my home, but not at market prices; and withdrew his offer angrily when I asked "If I cannot make rent, would you evict me?" He abruptly said "never mind" and subsequently informed other members of my family that I had "gotten angry" at him for making the offer.

113.   As a result of this pattern of practice, it was my reasonable inference that my family intended to capitalize upon my disability by extorting the sale of my home at a below market price; with no intention of allowing me to retain residency until the conclusion of my legal and medical disputes.

114.   Moving forward to December of 2015; Michelle Safford and Jonathan Alan Keck II engaged in an extensive period of time during which they vandalized and neglected the home; and ultimately attempted to extort my surrender or abandonment of the home, as described more fully above.

115.   Subsequent to surrendering Residency, Michelle Safford's Mother, Janet Gereau made numerous threats to have my home condemned over the vandalism done by Ms. Safford and Mr. Keck, and retained an attorney, Lewanna Bell-Lloyd on a Limited Representation basis to attempt to enforce those threats via legal action.

116.   To Ms. Bell-Lloyd's credit, she did not pursue legal action nor apparently continue her representation of Ms. Safford subsequent to being informed of the full nature of the vandalism and threats which had been made against me.

117.   At all times, all members of my family were demanding that I surrender all rights to medical care and benefits; and that I surrender possession and residency in my home; allegedly in violation of The Hobbs Act.

118.   NOTICE OF INTENT AND STATEMENT OF GOOD FAITH. I have attempted to the best of my physical ability to prepare a much superior pleading than this; and have found myself consistently incapable.

119.   The effects of seven years of medical neglect, and physical and psychological abuse; coupled with the fact of literally hundreds of individual acts of abuse and neglect and witness intimidation has left me incapable of completing even the most basic tasks necessary for the preservation and restoration of my rights, and of my life.

120.   It is my intention, to the extent that I am able, to continue to seek legal representation and alternative sources of relief.

121.   However, seven years of experience has left me with no hope of ever attaining the relief which I require.

122.   I will continue to comply with the rules of the court to the best of my ability; and will supplement and amend the pleadings as the law allows, and with permission of the court to bring these allegations as close to expectations as I can attain.

123.   But I am dying. The production of this pleading, even in its current form, has caused me extreme pain and escalation of my neurological symptoms to the point that I nearly sought emergency care...and was prevented from doing so largely by the abuse that I have suffered in every prior instance in which I have sought emergency care.

WHEREFORE, Plaintiff seeks declaratory judgment, injunctive relief, damages and civil penalties in excess of $75,000

**IV.**    **Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff, Scott B. Sullivan seeks actual damages, punitive damages, and civil penalties in excess of $75,000  The damages caused by the defendants' actions are ongoing, as the plaintiff's Tarlov Cyst Disease remains incompletely and incorrectly diagnosed and untreated; the defendants' deceptive, unconscionable, and legally prohibited acts and practices are ongoing; including without limitation intentionally and / or negligently mis-diagnosing patients with Tarlov Cyst Disease, refusing medical services to injured workers presumed to be covered under the Kansas Worker's Compensation Act, and refusing medical care to patients covered under Subsidized health insurance policies (Affordable Care Act and Medicaid);  and (see attached continued pleading)

**V.**    **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.**    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          01/22/2019

Signature of Plaintiff          _Scott B. Sullivan_

Printed Name of Plaintiff      Scott B. Sullivan

**B.**    **For Attorneys**

Date of signing:          _____

Signature of Attorney      _____

Printed Name of Attorney    _____

Bar Number            _____

Name of Law Firm        _____

Street Address          _____

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

State and Zip Code

Telephone Number

E-mail Address

_____

_____

_____

V.    Do you claim the wrongs alleged in your complaint are continuing to occur at the present time? Yes [X]    No [ ]

VI.   Do you claim actual damages for the acts alleged in your complaint?
      Yes [X]    No [ ]

VII.  Do you claim punitive monetary damages?   Yes [X]    No [ ]

If you answered yes, state the amounts claimed and the reasons you claim you are entitled to recover money damages.

Damages are in excess of $75,000 including loss of income, loss of support / consortium, inability to retain employment, unpaid medical bills for which I was provided no care, loss of insurance benefits (both medical and financial), loss of contractual benefits (as the OnForce insurance was not legally binding worker's compensation), loss of the benefits of medical services damage to my home due to the vandalism / neglect of Ms. Safford and Mr. Keck, future medical and support due to the cumulative effects (particularly permanent nerve damage) of the delays and refusal to treat Tarlov Cyst Disease, attorneys' fees (if representation could be attained), and punitive damages to deter the mistreatment of people with Tarlov Cyst Disease as the abuse and neglect of people with this disease is nearly universal throughout the entire health care, insurance, legal services industries, and within the general population at large -- most particularly (and most harmfully) within the families of people with Tarlov Cyst Disease who neglect, abuse, and with-draw support from people with the disease because they are unaware of the disease, unaware that their "loved" one has the disease, and the persistent failure and refusal of doctors to diagnose and treat the disease convinces families that the victims or Tarlov Cyst Disease are either faking their symptoms or are merely mentally ill. Due to the extreme unconscionability and the inherent deceptiveness of withholding medical diagnoses and treatments under false pretenses, I am also seeking maximum Enhanced Civil Penalties under the Kansas Consumer Protection Act.

4

VIII.   Administrative Procedures:

A.      Have the claims which you make in this civil action been presented through any type of Administrative Procedure within any government agency?
Yes ☐   No ☒

B.      If you answered yes, give the date your claims were presented, how they were presented, and the result of that procedure:

_____

_____

_____

C.      If you answered no, give the reasons, if any, why the claims made in this action have not been presented through Administrative Procedures:

Pain and fear are the only reasons that I have not pursued these claims or other claims through administrative or other channels for the past three years. During the first four years subsequent to my injury, I was relentlessly abused and neglected by these defendants and by others, because they did not believe in my disability. When the Tarlov Cysts were diagnosed, the abuse got worse, the threats escalated, and I withdrew all pending claims; while still seeking legal and medical assistance; and tried, but failed to complete any legal pleadings which would satisfy the court. My condition is now so severe that I am forced to go forward with litigation to repair the damages.

IX.     Related Litigation:
Please mark the statement that pertains to this case:

☐      This cause, or a substantially equivalent complaint, was previously filed in this court as case number _____ and assigned to the Honorable Judge _____.

☒      Neither this cause, nor a substantially equivalent complaint, previously has been filed in this court, and therefore this case may be opened as an original proceeding.

_Scott B Sullivan_
Signature of Plaintiff

_Scott B Sullivan_
Name (Print or Type)

_7214 W 71st Terrace_
Address

_Overland Park  KS    66204_
City            State        Zip Code

_(913) 265-5949_
Telephone Number

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates { ☐Wichita,   ☒Kansas City , or   ☐Topeka} , Kansas as the
(Select One)

location for the trial in this matter.

Signature of Plaintiff

## REQUEST FOR TRIAL BY JURY

Plaintiff requests trial by jury { ☒Yes or ☐No }
(Select One)

Signature of Plaintiff

Dated: _____
(Rev. 10/15)

6